**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **GLOBAL CLIENT SOLUTIONS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 10-CV-0123-CVE-TLW** |
| | ) | |
| **FLUID TRADE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Now before the Court is Fluid Trade, Inc.'s Motion to Dismiss or, in the Alternative, to Stay (Dkt. ## 15, 16).  Defendant Fluid Trade, Inc. (Fluid Trade) asks the Court to dismiss plaintiff's petition to compel arbitration (Dkt. # 2) or, in the alternative, to stay this case under Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976), pending the outcome of a parallel case filed in Massachusetts state court.  Plaintiff Global Client Solutions, LLC (GCS) asks the Court to deny defendant's motion and to compel arbitration of the claims filed by Fluid Trade in the Massachusetts state court action.

## I.

In September 2008, Fluid Trade and GCS initiated discussions on a proposal for Fluid Trade to assist GCS with the development of debt management software, and the parties entered a non-disclosure agreement preventing the disclosure of any confidential information exchanged during their negotiations.  GCS states it formed a wholly-owned subsidiary, Debt Exchange LLC (Debt Exchange), to develop and maintain the software. Dkt. # 2, at 2.  GCS is a wholly owned subsidiary of Global Holdings, LLC (Global Holdings), and Global Holdings, GCS, and Debt Exchange maintain their headquarters in Tulsa, Oklahoma.  Fluid Trade is Delaware corporation with its principal place of business in Boston, Massachusetts.

Fluid Trade and Debt Exchange entered a Software Development, License, System Use and Hosting Agreement (the Agreement) in February 2009 that provides a procedure for resolving disputes arising under the Agreement.  If a party believes that a breach of the Agreement has occurred, that party must send written notice to the party allegedly in breach and allow thirty days to cure the breach.  Id., Ex. A., at 5.  After thirty days, the dispute may be escalated by contacting the specified representative for the breaching party if the alleged breach has not been fully cured. Id. at 6.  If the breach is not fully cured or a plan to resolve the breach is not in place within thirty days of notice of escalation, the aggrieved party may terminate the Agreement and submit the dispute to arbitration.  The arbitration provision states:

**24.    Arbitration**

24.1    If any dispute arising out of or relating to this Agreement, including, without limitation, any dispute regarding the breach or violation hereof or any dispute regarding the conduct of business pursuant to this Agreement, cannot be settled by direct negotiation between the parties within sixty (60) days of either party providing written notice to the other regarding such dispute, such dispute shall be settled by binding arbitration.  Any such arbitration shall take place in Tulsa, Oklahoma if such dispute is brought by Licensor, or in Boston, Massachusetts if such dispute is brought by Licensee, and brought before an arbitrator appointed by the American Arbitration Association.

Id., Ex. A, at 11.  The Agreement defines Fluid Trade as the Licensor and Debt Exchange as the Licensee.

Debt Exchange terminated the Agreement in early 2010 after the parties were unable to resolve an alleged breach identified by Debt Exchange.  Debt Exchange followed the procedure specified by the Agreement, and provided notice of breach and escalated the dispute before terminating the Agreement.  However, Debt Exchange did not seek to arbitrate any claims against

2

Fluid Trade and advised Fluid Trade that it could arbitrate any disputes arising under the Agreement in Tulsa.

On January 20, 2010, Fluid Trade filed a lawsuit against GCS and Donald Airey, Fluid Trade's former Chief Technology Officer, in Massachusetts state court, Fluid Trade, Inc. v. Global Client Solutions, LLC and Donald Airey, SUCV2010-00248-BLS2 (Suffolk County Superior Ct, Massachusetts) (Massachusetts action).  Fluid Trade alleged that it originally believed that GCS would be the party signing the Agreement, but GCS advised Fluid Trade that Debt Exchange, not GCS, would sign the Agreement. Dkt. # 2, Ex. C, at 3.  However, Fluid Trade states that GCS led it to believe that GCS "stood fully behind Debt Exchange with regard to [Debt Exchange's] obligations" under the Agreement. Id.  Fluid Trade alleges that GCS was considering selling itself and the debt management software, DebtTrak, and GCS "began to distinguish itself and Debt Exchange in its dealings with [Fluid Trade]" and "caused Debt Exchange to commence complaining about [Fluid Trade's] performance under the Agreement, even though [Fluid Trade] was in full compliance and Debt Exchange was not . . . ." Id. at 5.  Fluid Trade also alleges that GCS and Airey conspired to disrupt Debt Exchange's and Fluid Trade's relationship and harm Fluid Trade's reputation in the business community. Id. at 5-8.  Debt Exchange notified Fluid Trade of an alleged breach of the Agreement in late November 2009, and Fluid Trade alleges that GCS encouraged Debt Exchange to falsely make a claim of breach in anticipation of terminating the Agreement. Id. at 11. The amended complaint in the Massachusetts action contains nine claims concerning GCS and Airey's alleged conspiracy to harm Fluid Trade: (1) deceptive and unfair business practice under Massachusetts law against Airey and GCS; (2) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 against Airey and GCS; (3) theft of trade secrets against Airey and GCS; (4)

intentional interference with contractual relations against Airey and GCS; (5) fraud in the inducement against GCS; (6) intentional interference with prospective economic advantage against GCS; (7) breach of fiduciary duty against Airey; (8) breach of employment contract against Airey; and (9) breach of a software purchase contract against Airey. Key issues in the Massachusetts action are the alleged misuse of the software developed by Fluid Trade for GCS and/or Debt Exchange and the validity of Debt Exchange's claims that Fluid Trade breached the Agreement. Dkt. # 2, Ex. C.

In the Massachusetts action, GCS filed a motion to dismiss, asserting that Fluid Trade's claims fell within the arbitration agreement and that Fluid Trade failed to state a claim upon which relief could be granted. Dkt. # 17, Ex. 5. GCS argued that Fluid Trade was required to arbitrate its claims against GCS in Tulsa under the "reverse forum" clause of the arbitration provision in the Agreement. Id. at 9. Before filing the Massachusetts motion to dismiss, GCS filed this action to compel arbitration. Dkt. # 2. GCS asked this Court to compel Fluid Trade to arbitrate its claims against GCS in Tulsa. Fluid Trade has filed a motion to dismiss or to stay this action. Dkt. # 15, 16.

## II.

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint must contain enough "facts to state a claim to relief that is plausible on its face" and the factual allegations "must be enough to raise a right to relief above the speculative level." Id. (citations omitted). "Once a claim has been stated adequately, it may be supported by

4

showing any set of facts consistent with the allegations in the complaint." Id. at 562.  Although

decided within an antitrust context, Twombly "expounded the pleading standard for all civil

actions." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953 (2009).  For the purpose of making the dismissal

determination, a court must accept all the well-pleaded allegations of the complaint as true, even if

doubtful in fact, and must construe the allegations in the light most favorable to claimant. Twombly,

550 U.S. at 555; Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007); Moffett v.

Halliburton Energy Servs., Inc., 291 F.3d 1227, 1231 (10th Cir. 2002).  However, a court need not

accept as true those allegations that are conclusory in nature.  Erikson v. Pawnee County Bd. Of

County Comm'rs, 263 F.3d 1151, 1154-55 (10th Cir. 2001).  "[C]onclusory allegations without

supporting factual averments are insufficient to state a claim upon which relief can be based." Hall

v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir. 1991).

　　　The parties ask the Court to consider documents outside the pleadings when ruling on

defendant's motion to dismiss.  When reviewing a motion to dismiss under Rule 12(b)(6), a district

court may "consider documents referred to in the complaint if the documents are central to the

plaintiff's claims and the parties do not dispute the documents' authenticity." Jacobsen v. Deseret

Book Co., 287 F.3d 936, 941 (10th Cir. 2002).  Plaintiff attached to its petition to compel arbitration

a copy of the Agreement and Fluid Trade's original and amended complaints filed in the

Massachusetts action.  See Dkt. # 2, Exs. A, B, C.  These documents are referenced in the petition

to compel arbitration and are central to plaintiff's allegations, and the parties agree that the Court

should consider these documents when ruling on defendant's motion to dismiss.  Continental Cas.

Co. v. American Nat'l Ins. Co, 417 F.3d 727 (7th Cir. 2005) (district court properly considered a

written contract containing an arbitration clause because the plaintiff referred to the contract in the

complaint and the arbitration agreement was central to the defendant's demand for arbitration). Each party has also attached letters and e-mails to its filings, and asks the Court to consider the letters and e-mails as support for its version of the facts relating to the breakdown of the parties' relationship.  See Dkt. # 17, Exs. 1, 2, 3, 4; Dkt. # 18, Exs. A, B, C, D, E, F.  However, these letters and e-mails were not referenced in the petition to compel arbitration and are not central to plaintiff's claims, and the Court may not consider the letters and e-mails when ruling on defendant's motion to dismiss.

## III.

Fluid Trade asks the Court to dismiss the case for failure to state a claim upon which relief can be granted, or stay the case under Colorado River until the Massachusetts action is completed. The Court will first consider whether the case should be stayed under Colorado River, because it would be inappropriate to rule on defendant's motion to dismiss if the Court is required to abstain under Colorado River.  Fluid Trade argues that plaintiff is forum shopping and all of the issues raised in the petition to compel arbitration will be resolved in the Massachusetts action.  GCS responds that no exceptional circumstances exist, and this case should not be stayed under Colorado River.

As a general rule, the mere existence of parallel proceedings in a state court do not permit a federal court to dismiss or abstain from exercising jurisdiction to decide a case before it. Allegheny County v. Frank Mashuda Co., 360 U.S. 185, 188-89 (1959).  "Abstention rarely should be invoked, because the federal courts have a 'vitually unflagging obligation . . . to exercise the jurisdiction given them." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996); Ankenbrandt v. Richards, 504 U.S. 689, 705 (1992).  However, the Supreme Court has recognized several

circumstances in which federal courts should stay or dismiss a case to avoid interfering with parallel state court proceedings. Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 292 (2005). For example, a federal court should abstain in order to avoid ruling on unclear state law, Railroad Commission of Texas v. Pullman Co., 312 U.S. 496 (1941), or to prevent interference with a complex state administrative proceeding, Burford v. Sun Oil Co., 319 U.S. 315 (1943).

In Colorado River, the Supreme Court held that concurrent proceedings in state and federal courts interfered with an express federal policy to avoid piecemeal litigation in cases to determine water rights under the McCarran Water Rights Suit Act, 43 U.S.C. § 666 (McCarran Amendment). Water is considered a scarce commodity in many of the western states, and Colorado had established complex administrative procedures to rule on applications for water rights. 424 U.S. at 804. In that case, the federal government initiated a claim in federal court seeking a declaration of the government's rights to water on its own behalf, as well as the waters rights of certain Indian tribes. After that suit was filed, the defendants instituted administrative proceedings in Colorado Water Division No. 7 to determine water rights under federal and state law. The Supreme Court affirmed the district court's decision to abstain based on the exceptional circumstances of that case. The Court clarified that abstention was not proper in every case where a state court proceeding was potentially duplicative of a federal case, but noted four factors to guide federal courts when deciding whether to proceed or abstain: (1) the risk of adjudicating rights to the same property; (2) the inconvenience of the federal forum; (3) the need to avoid piecemeal litigation; and (4) the order which jurisdiction was obtained by the state and federal courts. Id. at 818. The McCarran Amendment provided evidence of congressional intent to establish a single proceeding for

7

determining water rights, and abstention was appropriate under the extraordinary circumstances of the case.

The first issue the Court must decide is whether this case and the Massachusetts action are parallel proceedings under Colorado River. State and federal proceedings are parallel if "substantially the same parties litigate substantially the same issues" in both cases. United States v. City of Las Cruces, 289 F.3d 1170, 1182 (10th Cir. 2002). The Court must consider the state proceedings as they actually exist to determine if the state and federal cases are parallel. Allen v. Board of Educ., Unified Sch. Dist. 436 (10th Cir. 1995). The parties do not dispute that the cases are parallel, because both courts have been asked to determine whether Fluid Trade's claims against GCS should be submitted to arbitration. The Court finds that this case and the Massachusetts action are parallel under Colorado River.

To determine if a stay is appropriate, the Court must consider the four factors identified in Colorado River, as well as other factors cited by the Tenth Circuit when applying Colorado River. This list of non-exhaustive factors includes at least the following seven factors: "(1) whether either court has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the courts obtained jurisdiction; (5) the vexatious or reactive nature of either the federal or the state action; (6) the adequacy of the state court action to protect the [federal] plaintiff's rights; and (7) whether the party opposing abstention has engaged in impermissible forum shopping." Int'l Asset Management, Inc. v. Holt, 487 F. Supp. 2d 1274, 1284 (N.D. Okla. 2007) (collecting factors applicable to Colorado River analysis from Supreme Court and Tenth Circuit precedent).

There is no property at issue in this case, and the first Colorado River factor is inapplicable. Fluid Trade argues that the federal forum is inconvenient, because it maintains its principal place of business in Massachusetts and it filed its lawsuit in Massachusetts. The Court finds that this factor is neutral due to the conduct of both parties and the "reverse forum" clause of the arbitration agreement. The federal forum may be inconvenient for Fluid Trade, but Fluid Trade agreed to arbitrate certain disputes in Tulsa. Likewise, Debt Exchange, a wholly-owned subsidiary of GCS, agreed to arbitrate in Boston if it were the party seeking arbitration. It appears that both parties are attempting to evade the effect of the reverse forum provision in the arbitration agreement, and it is reasonable to assume that Oklahoma is as inconvenient for Fluid Trade as Massachusetts is for GCS. This factor is neutral and does not favor either party. As to the third Colorado River factor, there is a general need to avoid piecemeal litigation, but this factor, standing alone, does not weigh strongly in favor of abstention. Rienhardt v. Kelly, 164 F.3d 1296, 1303 (10th Cir. 1999). However, due to the nature of this case, the Court finds that the existence of piecemeal litigation does not weigh in favor of abstention. The Federal Arbitration Act, 9 U.S.C. § 1 et seq. (FAA) expressly grants federal courts concurrent jurisdiction to hear a case seeking to compel arbitration of claims raised in another forum, whether the other forum is a state or federal court. 9 U.S.C. § 4. The FAA favors enforcement of private agreements to arbitrate, even if this results in piecemeal adjudication of claims or results in delay for the parties. Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 220-21 (1985). Although Fluid Trade filed the Massachusetts action first, this does not automatically favor abstention under Colorado River. In Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983), the Supreme Court held that the order of filing carries little or no weight under Colorado River when the second case was filed solely to compel arbitration of the first-filed case.

9

Id. at 20-21.  The FAA often requires a party to file a second lawsuit to compel arbitration in the appropriate federal district court, and a district court may abuse its discretion by abstaining under Colorado River if it refuses to hear a case seeking to compel arbitration of claims raised in an earlier-filed lawsuit.  Id. at 22.  The Court finds that the order of filing does not favor abstention under Colorado River, because the strong federal policy favoring "rapid and unobstructed" resolution of arbitration issues would be frustrated if the Court abstained.  See id. at 22-23.

The fifth and seventh factors concern the vexatious or reactive nature of the federal litigation and whether the party opposing abstention has engaged in forum shopping.  Fluid Trade argues that this case should be categorized as "vexatious" because GCS is attempting to enforce an arbitration agreement to which it is not a party and this lawsuit was filed solely to delay the Massachusetts action.  Dkt. # 17, at 23.  GCS responds that Fluid Trade filed the Massachusetts action to circumvent the arbitration agreement, and the Court should treat the Massachusetts action as vexatious or reactive litigation.  Dkt. # 18, at 16.  The Court finds that both parties impermissibly rely on the alleged merits of their arguments for or against arbitration, and the Court will not consider these arguments.  Both parties have engaged in a certain amount of gamesmanship and forum shopping.  Debt Exchange terminated the agreement but refused to arbitrate its dispute and, instead, demanded that Fluid Trade arbitrate any dispute in Tulsa.  Fluid Trade responded by filing a lawsuit in Massachusetts against GCS, instead of Debt Exchange, and this suggests that Fluid Trade was attempting to circumvent the reverse forum clause of the arbitration agreement.  Given this gamesmanship, the Court finds that these factors do not favor either party.

As to the sixth Colorado River factor, GCS argues that Massachusetts state court is not an adequate forum, because the Massachusetts state court lacks the authority to compel arbitration in

10

Tulsa. Fluid Trade argues that GCS has filed a motion to dismiss in the Massachusetts action raising this precise argument, and GCS apparently believes that the state court has authority to consider this argument. Dkt. # 17, at 22. There is no indication that the state court is an inadequate forum to consider GCS's argument, because the state court has the authority to dismiss any claims that it finds should be arbitrated in Tulsa. The Court also notes that the state court has set GCS' motion to dismiss for hearing on August 19, 2010, and there is no indication that the state court is unwilling to consider GCS's argument. Dkt. # 19, Ex. 3, at 2.

The Court finds that this case does not present exceptional circumstances supporting a stay under Colorado River. Ordinarily, a federal court is not required to abstain under Colorado River when a party files a petition to compel arbitration of claims asserted in a prior state court case, and this case is no different. See Moses H. Cone Mem'l Hosp., 460 U.S. at 14-17; Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc., 571 F.3d 299 (3d Cir. 2009); Snap-on Tools Corp. v. Mason, 18 F.3d 1261 (5th Cir. 1994). The FAA expressly authorizes federal courts to hear a petition to compel arbitration of claims pending before another court, and the general need to avoid piecemeal litigation does not override the overarching federal policy in favor of enforcing arbitration agreements.

## IV.

Fluid Trade argues that GCS's petition to compel arbitration should be dismissed because (A) Debt Exchange breached the Agreement by failing to initiate arbitration in Boston after terminating the Agreement and the Court lacks the authority to compel arbitration in Boston; (B) GCS lacks standing to enforce the arbitration agreement; and (C) Fluid Trade's claims in the Massachusetts action do not fall within the arbitration agreement.

11

**A.**

Fluid Trade argues that Debt Exchange and/or GCS breached the Agreement by failing to initiate arbitration in Boston after terminating the Agreement, and GCS's failure to abide by the terms of the Agreement preclude it from seeking to compel arbitration in Tulsa. Fluid Trade relies on the arbitration agreement, which states that "[a]ny such arbitration shall take place in Tulsa, Oklahoma if such dispute is brought by Licensor, or in Boston, Massachusetts if such dispute is brought by Licensee . . . ." GCS responds that the claims against GCS were filed by Fluid Trade and concern Debt Exchange's alleged breach of the Agreement, and the arbitration agreement requires arbitration to take place in Tulsa.

The FAA permits a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement" to file a petition to compel arbitration in federal district court. 9 U.S.C. § 4. When an arbitration agreement includes a forum selection clause, only a federal district court within the specified forum may issue an order compelling arbitration. Ansari v. Qwest Communications Corp., 414 F.3d 1214, 1219, 1220 (10th Cir. 2005); Merill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer, 49 F.3d 323, 327 (7th Cir. 1995). However, this issue relates to the district court's venue, not its subject matter jurisdiction, and a party may waive its statutory right to litigate arbitration issues within the forum specified in the parties' arbitration agreement by failing to raise this issue. 1mage Software, Inc. v. Reynolds & Reynolds Co., 459 F.3d 1044, 1052 (10th Cir. 2006) (affirming decision by federal district court in Colorado compelling arbitration in Ohio).

The parties dispute who was responsible for the termination of the Agreement and where any subsequent arbitration should be conducted. Fluid Trade claims that Debt Exchange walked away from the Agreement after the alleged breaches of the Agreement were not cured, and Debt Exchange

was required to arbitrate its right to terminate the Agreement in Boston. Debt Exchange did not seek to arbitrate its dispute with Fluid Trade, and advised Fluid Trade that it could bring arbitration in Tulsa if it disagreed with Debt Exchange's decision to terminate the Agreement. Instead of arbitrating this dispute in Boston or Tulsa, Fluid Trade filed the Massachusetts action against GCS and Airey alleging, inter alia, that they conspired to steal Fluid Trade's intellectual property and encouraged Debt Exchange to breach the Agreement under false pretenses. Both parties rely heavily on letters exchanged between counsel to support their arguments that the opposing party has not complied with the arbitration agreement. However, the Court has determined that it may not consider the letters when ruling on defendant's motion to dismiss, and the Court will rely on the allegations of the petition to compel arbitration, the plain language of the arbitration agreement, and the state court pleadings. A motion to dismiss is not a substitute for a motion to compel arbitration, and the Court may not consider evidence outside of the pleadings unless that evidence was referenced in the petition to compel arbitration and is integral to plaintiff's claims.

The Court finds that plaintiff's petition to compel arbitration alleges a sufficient factual basis under which the Court could compel arbitration in Tulsa of Fluid Trade's claims against GCS. While the Agreement specifies where arbitration must be brought, it does not specify whether a party terminating the Agreement has an obligation to seek arbitration. Instead, the Agreement states that arbitration "shall take place in Tulsa, Oklahoma if such dispute is brought by [Fluid Trade.]" Dkt. # 2, at 3. The petition to compel arbitration requests arbitration of claims filed by Fluid Trade in the Massachusetts action, and these claims relate to alleged misconduct by GCS. Assuming that GCS has standing to seek to compel arbitration, this is not a dispute which GCS would bring in arbitration on its own behalf. Instead, Fluid Trade is seeking damages based on GCS' and Airey's

13

alleged conspiracy, and seeks at least $7 million from those parties.  Under the "reverse forum" clause of the arbitration agreement, Fluid Trade would be required to arbitrate similar claims against Debt Exchange in Tulsa.  Based on the allegations of the petition to compel arbitration, the Court finds that defendant's motion to dismiss on this ground should be denied, because it is plausible that the Court could compel arbitration of Fluid Trade's claim in Tulsa.[1]

## B.

Fluid Trade claims that GCS was not a signatory to the Agreement, and it lacks standing to seek arbitration of Fluid Trade's claims against it in the Massachusetts action.  GCS responds that a non-signatory to an arbitration agreement may compel arbitration under the doctrine of equitable estoppel, and it has alleged a plausible basis to compel arbitration of Fluid Trade's claims against GCS.

The FAA represents a strong public policy in favor of arbitration, and states that a "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable . . . . " 9 U.S.C. § 2; Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758 (2010); Vaden v. Discover Bank, 129 S. Ct. 1262, 1271 (2009).  While not expressly stated in the FAA, federal courts have recognized that there are bases under which a non-signatory may compel arbitration of claims brought by a signatory to an arbitration agreement.  Ragone v. Atlantic Video at Manhattan Center, 595 F.3d 115, 127 (2d Cir. 2010); Gibson v. Wal-Mart Stores, 181 F.3d 1163, 1170 n.3 (10th Cir. 1999).  In Arthur Andersen LLP v. Carlisle, 129 S. Ct. 1896 (2009), the Supreme Court stated

---

[1]     This ruling also disposes of Fluid Trade's argument that the Court lacks jurisdiction to hear this case, because it is possible that the Court may compel arbitration in Tulsa, rather than Boston.

that "'traditional principles' of state law allow a contract to be enforced by or against nonparties to

the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference,

third-party beneficiary theories, waiver and estoppel,'" and reversed the Sixth Circuit's categorical

rejection of a request by a non-party to an arbitration agreement for a stay under § 3 of the FAA.

Id. at 1902.  GCS claims that it is entitled to seek arbitration against Fluid Trade under the theory

of equitable estoppel.  Equitable estoppel may be used to compel arbitration by a non-signatory in

two general situations:

> (1) "equitable estoppel applies when the signatory to a written agreement containing
> an arbitration clause 'must rely on the terms of the written agreement in asserting
> [its] claims' against the nonsignatory;" or (2) "application of equitable estoppel is
> warranted . . .  when the signatory [to the contract containing the arbitration clause]
> raises allegations of . . . substantially interdependent and concerted misconduct by
> both the nonsignatory and one or more of the signatories to the contract."

MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999).

The parties do not dispute that the arbitration agreement is enforceable as to Fluid Trade and

Debt Exchange, but they do dispute whether GCS may compel Fluid Trade to arbitrate the claims

raised in the Massachusetts action.  The general rule is that non-signatory cannot be compelled to

arbitrate "unless it is bound 'under traditional principles of contract and agency law' to be akin to

a signatory of the underlying agreement."  E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber

& Resin Intermediates, S.A.S., 269 F.3d 187, 194 (3d Cir. 2001).  In this case, a non-signatory,

GCS, is seeking to compel arbitration against a signatory to an arbitration agreement, Fluid Trade,

and this is permissible under some circumstances.  PRM Energy Systems, Inc. v. Premenergy, LLC,

592 F.3d 830, 833-34 (8th Cir. 2010); Mundi v. Union Sec. Life Ins. Co., 555 F.3d 1042, 1045-46

(9th Cir. 2009).

15

Fluid Trade argues that GCS "deliberately established Debt Exchange as a separate corporate entity for the purpose of the Fluid Trade contract," and GCS cannot now attempt to step into Debt Exchange's position when seeking arbitration of Fluid Trade's claims against GCS. Dkt. # 17, at 15. GCS responds that equitable estoppel provides a basis for it to enforce the arbitration agreement against Fluid Trade and, if equitable estoppel applies, GCS will have standing to bring its petition to compel arbitration. Dkt. # 18, at 8. Fluid Trade does not address GCS's argument that equitable estoppel might apply, and argues generally that a non-signatory should not be permitted to enforce an arbitration agreement. The authority cited by Fluid Trade predates the Supreme Court's decision in Arthur Andersen, and federal courts that have considered Arthur Andersen have found that a non-signatory may seek to compel arbitration against a signatory in some circumstances. See Donaldson Co., Inc. v. Burroughs Diesel, Inc., 581 F.3d 726, 732 (8th Cir. 2009); Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n, ___ F. Supp. 2d . ___, 2010 WL 1979440 (N.D. Ill. May 17, 2010). Fluid Trade also ignores authority predating Arthur Andersen treating equitable estoppel as a basis for a non-signatory to enforce an arbitration agreement against a signatory. The Court also notes that the parties' arguments are primarily a factual dispute concerning the relationship between GCS and Debt Exchange,[2] and it is not appropriate to resolve this issue on a motion to dismiss. GCS has alleged a basis for it to enforce the arbitration agreement against Fluid Trade, and Fluid Trade's

---

[2]     Although GCS was not a signatory to the Agreement, Fluid Trade alleges that "GCS . . . led [Fluid Trade], by its words and deeds, to understand that GCS stood fully behind Debt Exchange with regard to the latter's obligations under the [A]greement." Dkt. # 2, Ex. C, at 3. This suggests that Fluid Trade entered the Agreement with the understanding that GCS backed Debt Exchange during and after negotiation of the Agreement. While this may support Fluid Trade's claims against GCS, it also implies that Fluid Trade knew that it was actually negotiating with GCS and that GCS has standing to enforce the arbitration agreement.

16

motion to dismiss should be denied to the extent that Fluid Trade claims that GCS lacks standing to compel arbitration of the claims asserted in the Massachusetts action.

## C.

Fluid Trade argues that its claims against GCS do not fall within the arbitration agreement, and the petition to compel arbitration should be dismissed. GCS responds that the Agreement contains a broad arbitration agreement that encompasses all of Fluid Trade's claims against GCS in the Massachusetts action.

The arbitration agreement requires the parties to arbitrate all disputes "arising out of or relating to this Agreement, without limitation, any dispute regarding the breach or violation hereof or any dispute regarding the conduct of business pursuant to this Agreement." Dkt. # 2, Ex. A, at 11. As the Court has noted, the FAA provides a strong federal policy in favor of enforcing arbitration agreements. ARW Exploration Corp. v. Aguirre, 45 F.3d 1455, 1462 (10th Cir. 1995). When determining if claims fall within an arbitration clause, a court must first determine whether the arbitration clause is broad or narrow. Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc., 567 F.3d 1191, 1196 (10th Cir. 2009). A broad arbitration provision is one that "refer[s] all disputes arising out of a contract to arbitration." Cummings v. FedEx Ground Package System, Inc., 404 F.3d 1258, 1262 (10th Cir. 2005). In contrast, a narrow arbitration provision "manifest[s] an intent to narrowly limit arbitration to specific disputes regarding the termination" of a contract. Id. The arbitration agreement in this case requires arbitration of all disputes "arising out of or relating to this Agreement, without limitation . . . or . . . regarding the conduct of business pursuant to this Agreement . . . ." Dkt. # 2, Ex. A, at 11. This does not place any limitation on the arbitrability of disputes arising under the Agreement or business conducted pursuant to the

Agreement, and the Court finds that this is a broad arbitration provision.  When reviewing a broad arbitration provision, "there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it."  Cummings, 404 F.3d at 1261 (quoting Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001)).

Fluid Trade has alleged six claims against GCS in the Massachusetts action: (1) deceptive and unfair business practice under Massachusetts law; (2) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (3) theft of trade secrets; (4) intentional interference with contractual relations; (5) fraud in the inducement against GCS; and (6) intentional interference with prospective economic advantage.  GCS argues that all of these claims fall within the arbitration agreement, because Fluid Trade's amended complaint includes numerous factual allegations concerning the formation and alleged breach of the Agreement and all of these facts are incorporated into each of Fluid Trade's claims.   Fluid Trade argues that the "illicit scheme" forming the basis of all of its claims is GCS' alleged agreement with Airey to obtain the DebtTrak software, and these claims do not arise under or relate to the Agreement and are not arbitrable.  Dkt. # 17, at 19.  It also claims that the parties intended only to arbitrate issues concerning  "whether or not the software developed under the Agreement works, or whether Debt Exchange has paid its contractual fees."  Id.

Fluid Trade's claims of unfair business practices and intentional interference with contract fall within the scope of the parties' arbitration agreement, because both of these claims are based on Fluid Trade's allegations that GCS interfered with Debt Exchange's performance under the Agreement and Fluid Trade did not receive payment for its services.  Contrary to Fluid Trade's assertion, the arbitration agreement does not limit arbitration to claims concerning the proper

18

functioning of the software or Fluid Trade's demands for payment.  If GCS can enforce the arbitration agreement, Fluid Trade is required to arbitrate "any dispute arise out of or relating to this Agreement."  Dkt. # 2, Ex A, at 11.  This includes any claims related to "the conduct of business pursuant to this Agreement.  Id.  Disputes concerning GCS' alleged attempts to obtain DebtTrak in violation of the Agreement and Fluid Trade's "loss of fees" due to these violations "relate to" the Agreement, even if acts were allegedly part of a separate conspiracy between GCS and Airey.

Fluid Trade's claims of computer fraud and abuse and theft of trade secrets also fall under the arbitration agreement.  Fluid Trade alleges that Airey and GCS conspired to steal the source code for DebtTrak and related technical information, and these acts violated Fluid Trade's right to maintain ownership of DebtTrak under the Agreement.  Fluid Trade measures its damages for both claims by its investment in DebtTrak and unpaid fees that Debt Exchange would have been required to pay under the Agreement.  The factual allegations supporting these claims are similar to those supporting Fluid Trade's unfair business practices and intentional interference with contract claims. Fluid Trade focuses on other aspects of its claims in an attempt to show that these two claims do not fall within the arbitration agreement, such as GCS' alleged encouragement of Airey to breach his employment contract with Fluid Trade and GCS' and Airey's alleged conspiracy to steal DebtTrak. However, Fluid Trade's attempt to exclude these claims from the scope of the arbitration agreement is unsuccessful.  The Agreement provides extensive and specific details about each parties right to use DebtTrak and Fluid Trade's right to continued ownership of DebtTrak, and GCS' alleged acts may also be characterized as a breach of the Agreement.  This is highlighted by Fluid Trade's use of the Agreement to establish its damages for its computer fraud and abuse and theft of trade secrets claims.

Fluid Trade's claim of fraud in the inducement also arises under or relates to the Agreement, and falls within the scope of the arbitration agreement. Fluid Trade alleges that GCS asked Fluid Trade to enter into the Agreement with Debt Exchange as the signatory, even though GCS knew that Debt Exchange was undercapitalized and could not pay damages in the event of a breach of the Agreement. Dkt. # 2, Ex. C, at 17. The alleged fraud was GCS's representation that it stood behind the Agreement and would honor Debt Exchange's obligations. Id. The allegations of the Fluid Trade's amended complaint are not limited to acts preceding execution of the Agreement, as a key component of Fluid Trade's claim is that Debt Exchange subsequently breached the Agreement under false pretenses at the request of GCS. This claim certainly relates to GCS's conduct leading up to the formation of the Agreement and its alleged "distancing" from Debt Exchange after the Agreement was executed, and this claims is arbitrable if GCS has standing to enforce the arbitration agreement.

Finally, the Court finds that Fluid Trade's claim of intentional interference with prospective economic advantage falls within the scope of the parties' arbitration agreement. Fluid Trade alleges that GCS contacted prospective investors of Fluid Trade and discouraged them from doing business with Fluid Trade. Id. at 18. It claims that GCS engaged in this conduct to drive Fluid Trade out of business or force Fluid Trade to sell DebtTrak at a "fire sale price." Id. This relates to GCS' and Airey's alleged conspiracy to obtain DebtTrak from Fluid Trade in violation of the Agreement, and the alleged acts forming the basis for this claim are simply part of the broader scheme alleged by Fluid Trade. The parties executed a broad arbitration provision requiring them to litigate any disputes arising under or relating to the Agreement or conduct pursuant to the Agreement, and this

may include collateral matters implicating the parties' rights and obligations under the Agreement.

Cummings, 404 F.3d at 1261.

   **IT IS THEREFORE ORDERED** that Fluid Trade, Inc.'s Motion to Dismiss or, in the

Alternative, to Stay (Dkt. # 15, 16) is **denied**.

   **DATED** this 1st day of July, 2010.

           CLAIRE V. EAGAN, CHIEF JUDGE
           UNITED STATES DISTRICT COURT